L. Dickinson BENNETT

v.

CENTERPOINT BANK, et al.

Civ. No. 90–423–D.

United States District Court,
D. New Hampshire.

April 11, 1991.

L. Dickinson Bennett, pro se.

Martha V. Gordon, Manchester, N.H., for Stone, Hahn, Centerpoint Bank.

W. Wright Danenbarger, Manchester, N.H., for Roy, Bellemore, Lavasseur, Bogers, Frederick, Kennedy, Demers and Salzman.

## ORDER

DEVINE, Chief Judge.

In this action, *pro se* plaintiff L. Dickinson Bennett ("Bennett") brings suit against Centerpoint Bank ("Centerpoint"), its chairman and president Philip M. Stone, and its general counsel Edward L. Hahn (collectively referred to as "Centerpoint defendants"). Additionally, Bennett sues defendants David B. Salzman, Richard P. Demers, Michael J. Kennedy, Anthony J. Frederick, Jr., Ronald H. Bogers, Donald J. Lavasseur, Robert A. Bellemore, and Ronald G. Roy.[1] These eight defendants (collectively referred to as "non-Centerpoint defendants") are local businessmen who were former interim directors of Community National Bank (in organization) ("CNB"). In his 43–count complaint, Bennett alleges numerous violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, accusing the defendants of bank fraud, securities fraud, mail fraud, wire fraud, and violations of the Hobbs Act, 18 U.S.C. § 1951, as well as money laundering and substantive violations of RICO under section 1962(b)–(d).[2] Plaintiff seeks over $2 million in damages.

All defendants move to dismiss this action for lack of standing based upon (1) Rule 12(b)(6), Fed.R.Civ.P., failure to state a claim under RICO, and (2) Rule 17(a), Fed.R.Civ.P., real party in interest. In addition, the defendants move for sanctions, including dismissal of the complaint with prejudice, costs, and attorney's fees. Plaintiff objects to the motions.

In reviewing a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., the district court must take the allegations of the complaint as true. *Knight v. Mills*, 836 F.2d 659, 664 (1st Cir.1987). With this in mind, the facts are summarized as alleged in the complaint.

### Background

CNB was a national banking association created on January 19, 1989. Plaintiff's Complaint at ¶ 15. Bennett and the non-Centerpoint defendants were interim directors of CNB from January 19, 1989, until November 8, 1989. *Id.* at ¶ 16. Centerpoint Bank, a guaranty savings bank, was incorporated on December 30, 1988. *Id.* at ¶ 19. Although it is disputed as to who initiated contact between Centerpoint and CNB, contact was made, and a letter of intent was entered into on October 17, 1989. *Id.* at ¶ 32. The letter states, in pertinent part, "2. As a result of meetings between representatives of Centerpoint and Community, the parties hereto have determined that it is in their mutual interest to explore a possible arrangement which would result in the establishment of a single bank, which bank would be Centerpoint." *Id.* at ¶ 32.

On or about November 7, 1989, the non-Centerpoint defendants formed B & M Associates ("B & M") and entered into a Non–Solicitation and Confidentiality Agreement with Centerpoint. *Id.* at ¶ 42. Mr. Bennett was not a party to this association, nor did he sign the Agreement. The minutes of a CNB interim directors' meeting held on November 4, 1989, discuss the Agreement and state in part that

Centerpoint proposes to enter into a non complete agreement with Community National Bank and to purchase assets of Community National Bank including but not limited to market research, consulting, services, etc. for a flat price of $200,000 lump sum or $250,000 over a five year period. In addition, some of Centerpoint Banks [sic] directors will buy into

---

**1.** Defendant Ronald G. Roy has filed for relief under chapter 7 of the Bankruptcy Code. Accordingly, any claims against him in this action have been stayed.

**2.** Jurisdiction is founded on 28 U.S.C. § 1331, federal question (RICO).

Manchester Bank Associates for a lump sum of $25,000.

*Id.* at ¶ 34.

According to the complaint, when the non-Centerpoint defendants, while still interim directors of CNB, signed the Agreement, a "significant change" occurred in the application to form CNB. *Id.* at ¶ 44. While it is not entirely clear what the "significant change" was, as a result of the signing of the Agreement, the Office of the Comptroller of the Currency ("OCC") required that the application for CNB be withdrawn. *Id.* As of November 8, 1989, CNB ceased to exist as a corporate entity. *Id.* at ¶ 45.

In a letter dated November 8, 1989, Bennett wrote to defendant Stone terminating the original letter of intent and stating that CNB and Centerpoint did not reach an agreement. Bennett requested that all documents obtained from CNB be returned. *Id.* at ¶ 47. It is unclear under whose authority or for whom Bennett was acting.

Bennett states in his complaint that although the Centerpoint defendants claimed they complied with Bennett's request, they did not. He states that defendant Centerpoint made a copy of a CNB subscriber and prospects list, which was a valuable asset of CNB. *Id.* at ¶¶ 48–49. Furthermore, Bennett alleges that they used that list as part of Centerpoint's efforts to complete its stock sale. *Id.* at ¶ 53.[3]

On November 8, 1989, defendants Salzman, Demers, and Hahn telephoned Leroy F. Stovall, Director for Analysis with the OCC. According to Mr. Stovall, "[d]efendants Salzman and Hahn stated that the organizers of Defendant Centerpoint [ ] and [CNB] had agreed to 'join forces' and to 'yield up the charter' for [CNB] (in organization)." *Id.* at ¶ 54. Furthermore, Mr. Stovall stated in a letter describing the telephone call that the defendants

essentially requested that the Office permit the stock subscription funds [of CNB] to remain in escrow while they attempted to persuade subscribers to transfer funds directly to the Center Point [sic] Bank escrow account. Both Corporate Manager Edward R. Rieder and I agreed to consider the request, but cautioned that such a transaction was irregular and probably impermissible under Office guidelines.

On November 9, 1989, after discussing the proposal to transfer escrow funds with my staff and with staff attornies [sic], I decided that the Office could not permit the subscribers' funds to remain in escrow. I instructed staff to prepare a letter instructing the escrow agent to refund the funds promptly to subscribers.

*Id.* at ¶ 55.

On November 10, 1989, Bennett alleges that defendant Hahn threatened[4] him during a telephone conversation. Bennett told Hahn that he intended to contact the OCC "to reaffirm that OCC prevent any transfers of [CNB] (in organization) escrow funds directly to [d]efendant Centerpoint. . . ." *Id.* at ¶ 56.

At a meeting of the interim directors of CNB held on November 11, 1989, plaintiff Bennett was removed as chairman of the board of CNB and was stripped of his authority to act on behalf of CNB or Manchester Bank Associates. Bennett was informed of the above in a letter dated November 11 and was ordered to return CNB's property to defendant Bellemore. *Id.* at ¶¶ 58–59.

In another letter dated November 11, 1989, defendants Salzman and Demers wrote to the subscribers of CNB stock concerning the developments involving Centerpoint. *Id.* at ¶ 61. Bennett alleges that this letter left out pertinent information

---

**3.** Bennett claims that neither Centerpoint nor any organizers of CNB (the court assumes he is referring to the non-Centerpoint defendants) purchased any of CNB's assets. *Id.* at ¶ 51.

**4.** The alleged threat consisted of the sentences, "Now you've done it. You've just gone over the line. You're going to get it now." *Id.* at ¶ 56.

that the CNB stock subscribers were entitled to know. *Id.* at ¶¶ 62–65.[5]

On November 15, 1989, the *Manchester Union Leader* published an article about Centerpoint, allegedly based upon a news release dated November 9, 1989,[6] which stated in part, "Centerpoint Bank and members of the Community National organizational group announced today that they have joined together under the Centerpoint Bank name." *Id.* at ¶¶ 66–67.

Bennett alleges that on November 13, 1989, defendants Salzman and Hahn once more contacted Mr. Stovall of the OCC in an attempt to delay a return of CNB subscriber funds or to secure a transfer of those funds. According to Bennett, the basis for this second attempt was a document telefaxed to the OCC stating that Bennett had been removed as Chairman of the Board of CNB. *Id.* at ¶ 70. In a letter written by Mr. Stovall to Bennett concerning the November 13, 1989 telephone conversation, he stated, "[t]hey called my attention to a telefaxed document received in the office on November 13, dated November 11, in which the national bank organizers removed you from the group. The callers argued that you had no authority to withdraw the application, even though I explained that this Office recognized you as spokesperson on the date you formally withdrew the application for [CNB]." *Id.* at ¶ 72.

On November 16, 1989, by letter, the non-Centerpoint defendants solicited stock subscriptions for Centerpoint from former subscribers of CNB.[7] Included with the letter was a "Supplement to Offering Circular" dated November 16, 1989, prepared by Centerpoint. *Id.* at ¶¶ 76–77. Once again, Bennett alleges that this circular left out a list of pertinent information that should have been included. *Id.* at ¶ 77.

A few days later, on November 22, 1989, the non-Centerpoint defendants filed a Verified Petition for Ex Parte Temporary Restraining Order in the Hillsborough County Superior Court against Bennett, among others, which included a Verified Writ of Summons. The TRO sought to preclude Bennett from communicating with former subscribers of CNB and with state and federal regulatory agencies.[8] The petition was denied by the court on November 22, 1989. The writ alleged that Bennett had falsely represented to the OCC that the non-Centerpoint defendants had violated federal banking laws. Furthermore, the writ alleged that Bennett had "converted the funds of subscribers for shares of common stock of CNB." *Id.* at ¶¶ 81–86. Bennett denied these allegations. *Id.* at ¶¶ 90–91.

Centerpoint successfully completed its stock offering by the December 5, 1989, deadline. *Id.* at ¶ 92.

Bennett alleges that the non-Centerpoint defendants "accepted payments, directly or indirectly, of $25,000 from certain directors of Defendant Centerpoint Bank and $200,000 from Centerpoint Bank." *Id.* at ¶ 93.

---

**5.** *Some of the information left out was "the name of the 'one bank' into which forces were to be joined," id. at ¶ 62; that defendants Salzman and Demers failed to inform the CNB subscribers that their funds would be returned, ¶ 63; that the aforementioned defendants failed to identify which of the two banks' stock offerings would close on December 5, 1989, ¶ 64; and that the two defendants failed to inform the CNB stock subscribers, prospects, and others that B & M Associates had been formed by the non-Centerpoint defendants; that the non-Centerpoint defendants had signed the Nonsolicitation and Confidentiality Agreement with Centerpoint; that Bennett had not signed the Agreement and was not a member of B & M; that the non-Centerpoint defendants were to receive $25,000 from certain directors of Centerpoint; and that the non-Centerpoint defendants were to receive $200,000 from Centerpoint on the* successful completion of Centerpoint's stock sale. *Id.* at ¶ 65.

**6.** The news release accompanied the November 11, 1989, letter to the CNB stock subscribers.

**7.** The letter described the procedure for subscribing to the new shares of stock.

**8.** In the petition, the non-Centerpoint defendants alleged that Bennett was making false statements to subscribers and that they had ongoing obligations to subscribers and regulatory agencies. In the complaint, Bennett states that the allegations are untrue. *Id.* at ¶ 83. He alleges, however, that he has ongoing obligations to CNB (in organization) and others because of his status as an organizer. *Id.* at ¶ 85.

According to Bennett, the non-Centerpoint defendants used that money to secure personal releases from First Mutual Bank for Savings for debts incurred by CNB. Apparently no releases were obtained for Bennett or for the defunct CNB. *Id.* at ¶ 94. Bennett further alleges that Centerpoint and the non-Centerpoint defendants "admit that no money was paid directly to B & M Associates by Defendant Centerpoint Bank and certain directors of Defendant Centerpoint Bank." *Id.* at ¶ 99. Bennett makes much of the fact that he does not know the identity of the "certain directors" of Centerpoint making the $25,000 payment and does not know the identity of the recipient of the $200,000 payment made by Centerpoint when it successfully completed its stock offering. *Id.* at ¶¶ 97, 99. However, he alludes to the identity of the recipient of the $200,000 by including in the complaint an excerpt from a letter written by Arland S. MacKnight, Deputy Bank Commissioner of the State of New Hampshire Banking Department. The letter, addressed to Bennett, states in part:

> The statement is correct in the 'Supplement to Offering Circular' that this department (we speak only for the state), negotiated the increase in the offering with the organizers of the proposed Centerpoint Bank. *This increase was necessary because of the $200,000 payment for the Noncompetition Agreement to the former Directors of Community National Bank* (in formation).

*Id.* at ¶ 100 (emphasis added).

Furthermore, Bennett alleges that various creditors of CNB are unpaid and that those creditors have looked to Bennett, among others, for payment. *Id.* at ¶ 102.[9]

On May 30, 1990, Centerpoint opened for business. *Id.* at ¶ 103.

### Discussion

The issue before the court is whether the plaintiff has standing to bring his claims under RICO. Under 18 U.S.C. § 1964(c), [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee.

The Supreme Court has mandated that in civil RICO cases "the plaintiff only has standing if, and can only recover to the extent that, *he has been injured in his business or property by the conduct constituting the violation.*" *Sedima, S.P.R.L., v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (emphasis added). Furthermore, any recoverable damages occurring by reason of a violation of § 1962(c) must flow from the commission of the predicate acts. *Id.* at 497, 105 S.Ct. at 3285. Causation is therefore a requisite element for standing under civil RICO. *See Nodine v. Textron*, 819 F.2d 347, 348 (1st Cir.1987); *Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 398 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

In *Pujol v. Shearson/American Express, Inc.*, 829 F.2d 1201 (1st Cir.1987), *later amended and appealed on other grounds*, 877 F.2d 132 (1st Cir.1989), the First Circuit set out two requirements for standing under § 1964(c): "(1) a plaintiff must show that there has been a violation of § 1962, and (2) he must show that his injury was caused by the violation." *Id.* at 1205. "The RICO Act provides no cause of action to individuals injured by acts other than criminal RICO violations." *Nodine v. Textron, Inc.*, 819 F.2d 347, 349 (1st Cir.1987). "A violation of § 1962 occurs if the defendant committed at least two 'predicate acts.' Conduct which can constitute a 'predicate act' is described in § 1961(1)." *Pujol* at 1205.

The alleged acts underlying Bennett's RICO claims are: (1) bank fraud under 18 U.S.C. § 1344(a)(1) and (2); (2) fraud in the sale of securities under 15 U.S.C. §§ 77q(a)(1), (2), and (3) and 77q(b); (3) mail fraud under 18 U.S.C. § 1341; (4) wire fraud under 18 U.S.C. § 1343; (5) interfer-

---

**9.** Bennett does not state the names of the creditors who are unpaid. He alleges, however, that "[o]thers have filed claims in amounts in excess of $1,400,000." *Id.* at ¶ 102.

ence with commerce by threats or violence under 18 U.S.C. § 1951(a); (6) the use of interstate transportation in aid of racketeering activity under 18 U.S.C. § 1952(a)(1) and (3); (7) money laundering under 18 U.S.C. § 1956; and (8) engaging in monetary transactions in property derived from specified unlawful activity under 18 U.S.C. § 1957. In addition, Bennett alleges substantive violations of section 1962(b) and (c) of RICO, as well as a conspiracy to violate RICO under section 1962(d) based upon the previously alleged predicate acts.

These violations are all valid "predicate acts" under section 1961(1). However, the complaint fails to allege the requisite causal connection under *Sedima* between the underlying violations and Bennett's alleged injuries. Even where Bennett has shown some connection, it is either too remote or there is only one predicate act involved, which is not sufficient to establish a "pattern of racketeering activity." *See Sedima, supra,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

After each count, Bennett alleges that he was injured in his business or property by the violation, but the complaint fails to state how that particular violation injured Bennett. Instead, the violations in the complaint allege injury to stock subscribers of CNB and Centerpoint Bank [10] and to CNB itself. After careful review of the *93-page* complaint, consisting of 283 paragraphs, it appears that Bennett's alleged injuries are as follows: (1) fear for his personal safety as a result of the alleged telephone threat by defendant Hahn; (2)

his removal as chairman of the board of the interim directors of CNB; (3) his ongoing obligations to CNB and others as an organizer of CNB; (4) his continued liability, if any, to First Mutual Bank for Savings as a result of the failure by the non-Centerpoint defendants to obtain a release for Bennett from First Mutual; and (5) his continuing liability, if any, to other creditors of CNB.[11] For the reasons stated below, the court finds that these injuries were not caused by any alleged RICO violations.

*Bank Fraud*

■ Counts I through IV allege that the defendants attempted to *obtain property of CNB* in violation of 18 U.S.C. § 1344(1) and (2).[12] The injury here, if any, was to CNB, the target and the victim of the alleged bank fraud. He asserts that his role as an organizer of a bank is synonymous with that of the role of a promoter of a corporation. Bennett argues that the attendant duties and responsibilities of a promoter to a corporation, its stock subscribers, and its creditors, give him standing as an organizer of CNB to sue the defendants under RICO. The court is unpersuaded.

Although the court was unable to locate case law that addresses whether promoters or organizers have standing to maintain civil RICO claims, the law in this circuit is that "[a] suit under RICO for injuries to the corporation, ... can only be brought by the corporation itself or by a shareholder suing derivatively on behalf of the corporation." *Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 29 (1st Cir.1987). Indeed, "[a] RICO action to recover for injury to the corporation 'is a corporate asset, and share-

---

**10.** Plaintiff's claims that Centerpoint Bank is the RICO enterprise and is liable for damages must fail. The First Circuit in *Schofield v. First Commodity Corp.,* 793 F.2d 28, 29 (1st Cir.1986), affirmed the district court's order, finding "that a RICO 'enterprise' may not be held liable for civil damages under § 1962(c) either directly or under principles of respondeat superior."

**11.** Bennett later complains that he was injured when he was deprived of the opportunity to successfully complete the organization of CNB. In addition he complains of injury via his role as a CNB organizer, when Centerpoint dispossessed and used a valuable CNB subscriber/prospects list to complete its stock sale with-

out compensating CNB. Plaintiff's Objections to Defendants' Motions to Dismiss and Defendants' Motions to Seek Sanctions at 6–7.

**12.** 18 U.S.C. § 1344 provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be filed not more than $1,000,000 or imprisoned not more than 20 years, or both.

holders cannot bring it in their own names without impairing the rights of prior claimants to such assets.' " *Id.* at 30 (citations omitted). *See also Bass v. Campagnone,* 838 F.2d 10, 12–13 (1st Cir.1988) (injuries alleged by plaintiffs are injuries sustained by the local union; therefore, local union, not plaintiffs, is real party in interest in RICO action). As a result, the court finds that Bennett has no standing to assert claims of bank fraud, when it is CNB that is the real party in interest.[13]

*Federal Securities Fraud Claims*

■ Counts V through XI allege that defendants violated 15 U.S.C. §§ 77q(a)(1), (2), (3), and 77q(b),[14] by issuing various solicitations, statements, and publications which omitted relevant information and which were sent to Centerpoint and CNB stock subscribers.

The defendants state that the only "victims of the alleged crimes would be those subscribers who purchased Centerpoint stock in reliance on the allegedly fraudulent mailings and publications." Defendants' Motion to Dismiss at 17. Furthermore, the defendants state that since Bennett neither purchased any stock in reliance on the fraudulent acts nor "relied to his detriment on any of the supposed misstatements or omissions," he therefore lacks standing to assert the claim. *Id.* at 17.

In response, Bennett relies on *Securities Investor Protection Corp. v. Vigman,* 908 F.2d 1461 (9th Cir.1990), to conclude that he has standing to bring this claim. In *Vigman,* the Ninth Circuit held "that the purchaser or seller standing limitation that applies to 10b–5 actions does not apply to RICO claims based upon predicate acts that are alleged to be securities fraud...." *Id.* at 1467. The court stated that "even though the predicate acts of a RICO claim may be based on allegations of fraud in the sale of securities, the RICO text does not require a plaintiff to be a purchaser or seller, so long as the plaintiff suffered injury 'by reason of' the alleged fraud." *Id.* at 1466.

However, *Vigman* does not hold that "anyone" can bring a securities fraud claim under RICO. A plaintiff still must show an injury "by reason of" the securities fraud. Bennett has failed to show an injury to his business or property by the defendant's conduct in the alleged securities fraud violations in the complaint. Rather, what he alleges is injury to Centerpoint and CNB stock subscribers. Furthermore, Bennett argues that he was damaged in his role as an organizer of CNB when Centerpoint, by fraudulently completing its stock sale, made a $200,000 payment to the non-Centerpoint defendants. He argues that the $200,000 belongs to CNB creditors because the defendants used assets of CNB. Once again, the harm, if any, is to the CNB creditors. The harm Bennett alleges is too remotely related to the predicate act of securities fraud to support a claim under RICO. *See Burdick v. American Express*

---

13. "[T]he 'real party in interest' is the party who, by the substantive law, possesses the right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." C. Wright, *Law of Federal Courts* § 70 (4th ed.1983).

14. § 77q. Fraudulent interstate transactions.
(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
(b) It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

*Co.*, 865 F.2d 527, 529 (2d Cir.1989) (plaintiff lacked standing when his allegations of securities and mail fraud injured defendant's customers, not plaintiff's business or property). Furthermore, Bennett claims as an injury his removal as chairman of the board of the interim directors of CNB. The First Circuit addressed a similar claim in *Pujol v. Shearson/American Express, supra*, 829 F.2d 1201. In that case,

> [t]he complaint alleged that Shearson and its agents violated the law by engaging in illegal banking transactions, defrauding investors and furthering such misdeeds through the use of the mail and wires. Pujol, however, was not a defrauded client or investor and was not a target of any of the acts pleaded as "predicate acts" in the RICO claim. Rather, the complaint alleged that he was fired, slandered and otherwise injured because of the actions he took to report and to stop the illegal schemes. Such injurious acts, taken as alleged, were clearly wrong.... The acts that injured Pujol, however, were not caused by the "predicate acts" alleged in the complaint within the meaning of *Sedima*'s causation requirement.

*Id.* at 1205.

Although Bennett fails to expressly state the reasons for his removal as chairman of the board, he appears to infer in the complaint that one reason was because of his contact with the OCC to prevent the transfer of CNB escrow funds to Centerpoint Bank. In any event, this act that allegedly injured Bennett was not caused by the predicate acts of securities fraud. *See Nodine v. Textron, Inc.*, 819 F.2d 347 (1st Cir.1987) ("[A]n employee discharged for reporting a criminal violation of his employer lacked standing to sue that employer under the RICO Act."); *Cullom v. Hibernia Nat'l Bank*, 859 F.2d 1211, 1218 (5th Cir.1988) (holding "that a person who refuses to participate in an activity which is violative of RICO and is constructively discharged for such a refusal may not sue ... under ... RICO...."). Bennett's claimed injury that he has lost the opportunity to successfully complete the organization of CNB is also insufficient to maintain his RICO claims. *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir.1990) (injury in the form of future lost business commissions too speculative to confer standing under RICO).

## Mail and Wire Fraud Claims

▮ Counts XII through XVII allege that the defendants knowingly devised and schemed to obtain property from *CNB* and *CNB subscribers* through various acts of mail fraud in violation of 18 U.S.C. § 1341.[15] Counts XVIII through XIX allege that defendants committed wire fraud in violation of 18 U.S.C. § 1343 [16] when they attempted to obtain "money or proper-

---

15. **§ 1341. Frauds and swindles**
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than

$1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 20 years, or both.

16. **§ 1343. Fraud by wire, radio, or television**
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 20 years, or both.

ty" via wire transmissions to the OCC in two instances. Once again, the injuries alleged in these counts are to CNB and CNB subscribers, not to Bennett. *See Pujol, supra.*

The Eleventh Circuit addressed alleged predicate acts of mail fraud in *O'Malley v. O'Neill,* 887 F.2d 1557 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990). In this case, the plaintiffs alleged in their complaint that the defendant "engaged in a pattern of mail fraud, and that when the plaintiffs refused to participate in or conceal the scheme, they were fired." *Id.* at 1560. The Eleventh Circuit explained that "[n]either in their complaint nor in their RICO case statement do plaintiffs demonstrate that they were injured by the alleged act of mail fraud. Instead, they allege that their injury arose as a result of the refusal to participate in or to conceal the fraudulent scheme." *Id.* at 1561.

The court found that not only did the plaintiffs fail to establish a causal nexus between the predicate act and their injury, *id.* at 1561, but they lacked standing because they were not the target or victims of the alleged fraud. *Id.* at 1563. Likewise, this court finds that Bennett was *not* the victim of the mail or wire fraud, nor has he established "a causal nexus" between the alleged predicate acts and his alleged injuries.

### Hobbs Act Claims

 Counts XX and XXI allege violations of the Hobbs Act, 18 U.S.C. § 1951(a).[17] In Count XX, the complaint

states that the defendants attempted to "obstruct, delay, or affect" the movement of escrow funds of CNB subscribers through extortion. Bennett does not allege that any funds of his were affected by the alleged extortion. Nor does he allege that he was a CNB subscriber. Hence he lacks standing to assert the claims of the CNB subscribers.

 In Count XXI, Bennett alleges that defendant Hahn threatened him physically on the telephone in violation of section 1951(a), and as a result Bennett was injured by his fear for his personal safety. Without reaching the question of standing, the court finds that this type of injury is not an injury to "business or property" as required by section 1964(c). Therefore, the claim is dismissed. *See Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1169 (3d Cir.1987) (no cause of action on a RICO claim for mental distress injury); *Grogan v. Platt,* 835 F.2d 844, 847 (11th Cir.1988) ("In our view, the ordinary meaning of the phrase 'injured in his business or property' excludes personal injuries, including pecuniary losses therefrom."), *cert. denied,* 488 U.S. 981, 109 S.Ct. 531, 102 L.Ed.2d 562 (1988); *Rylewicz v. Beaton Services, Ltd.,* 698 F.Supp. 1391, 1395–96 (N.D.Ill.1988) ("The phrase 'business and property' excludes personal injuries or political damages."), *aff'd,* 888 F.2d 1175 (7th Cir.1989).

### Travel Act

 Counts XXII through XXXIV allege that defendants violated 18 U.S.C. § 1952(a)(1),[18] by unlawfully distributing

---

17. **§ 1951. Interference with commerce by threats or violence**

 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

18. **§ 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises.**

 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or

foreign commerce, including the mail, with intent to—

 (1) distribute the proceeds of any unlawful activity; or

 (2) commit any crime of violence to further any unlawful activity; or

 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

proceeds gained from the alleged predicate acts of bank fraud and securities fraud. Additionally, Bennett claims that the defendants violated section 1952(a)(3) through the unlawful promotion and maintenance of Centerpoint via previously alleged predicate acts in the complaint.

Counts XXII, XXIII, and XXVI–XXXIV are dismissed as they allege only one predicate act. *See Pujol, supra,* at 1205; *Sedima, S.P.R.L. v. Imrex Co., supra,* 473 U.S. at 478 n. 14, 105 S.Ct. at 3285 n. 14.

Count XXIV alleges two predicate acts in violation of section 1952(a)(3); however, two acts in this case are not sufficient to form a "pattern of racketeering activity" required under the statute. *Id.*

Count XXV alleges 600 predicate acts— one for each solicitation letter mailed. However, the only victims in this count that the court can find are CNB and CNB subscribers.

Moreover, having found that plaintiff lacks standing to assert the underlying predicate acts of bank fraud and fraud in the sale of securities, Bennett has no legal basis to assert that defendants violated 18 U.S.C. § 1952(a).

*"Money Laundering" Claims*

Counts XXXV–XXXIX and XL–XLII allege violations of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), and (a)(1)(B)(ii),[19] and 1957(a),[20] respectively. Each count alleges one single predicate act

of misusing funds derived from the earlier-claimed predicate acts of bank and securities fraud. One act does not a pattern make.

Additionally, these counts fail to clearly allege whom the injury targeted. From the complaint, the best the court can infer is that it is the Centerpoint shareholders. Bennett has not alleged that he is a Centerpoint shareholder, and he therefore can claim no injury to his "business or property".

Since the court has concluded that Bennett lacks standing to assert any of the aforementioned predicate acts on which his entire claim is based, his substantive conspiracy claims, Count XLIII must also be dismissed. *See Sedima, supra,* at 495, 105 S.Ct. at 3285.

Bennett has diligently pointed out alleged injuries to the "business and property" of various other groups of people, none of whose rights the court finds he has standing to assert.

CNB ceased to exist the minute Bennett withdrew the application. Although the court is not obligated to trace the plaintiff's injuries to their source, the court finds that the injuries he claims occurred "as a result of" the withdrawal of the application.

The court is unclear as to the connection Bennett makes between an excerpt he provides from 12 C.F.R. § 16.7[21] and standing

---

19. **§ 1956. Laundering of monetary instruments**
 (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
 (A)(i) with the intent to promote the carrying on of specified unlawful activity

 . . . . .

 (B) knowing that the transaction is designed in whole or in part—
 (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
 (ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in

the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

20. **§ 1957. Engaging in monetary transactions in property derived from specified unlawful activity**
 (a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

21. In pertinent part, 12 C.F.R. § 16.7(c) states:
 The following information shall be included on the cover page of the offering circular:

 . . . . .

 IF FOR ANY REASON THE BANK DOES NOT OPEN FOR BUSINESS OR IF FUNDS

to assert RICO claims. This section of the Code of Federal Regulations does not confer standing on Bennett to assert RICO claims just because he may have had to bear the costs or expenses of organizing a bank if it failed to organize.

For the reasons stated hereinabove, defendants' motions to dismiss (documents no. 6 and 8) are hereby granted. With respect to defendants' motion for sanctions under Rule 11, Fed.R.Civ.P. (document no. 7), the court finds that the *pro se* plaintiff here has made a reasonable effort to find legal support for his theory of standing. Accordingly, the motion is denied, each party to bear his own costs.

SO ORDERED.

ARE RETURNED TO SUBSCRIBERS, ALL OF THE CASH PAID BY THE SUBSCRIBERS FOR THEIR SHARES WILL BE RETURNED, PLUS OR MINUS ANY PROFITS OR LOSSES INCURRED THROUGH INVESTMENT OF SUCH FUNDS IN UNITED STATES GOVERNMENT SECURITIES. ANY OTHER COSTS OR EXPENSES WILL BE BORNE BY THE ORGANIZERS.
(Emphasis added.)