USCA1 Opinion

 

 [NOT FOR PUBLICATION] ___________________
No. 91-1603 L. DICKINSON BENNETT, Plaintiff, Appellant, v. CENTERPOINT BANK, ET AL., Defendants, Appellees. __________________
No. 91-1604 L. DICKINSON BENNETT, Plaintiff, Appellee, v. CENTERPOINT BANK, ET AL., Defendants, Appellants. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Shane Devine, U.S. District Judge] ___________________ Before Breyer, Chief Judge, Selya and Cyr, Circuit Judges. ___________________ L. Dickinson Bennett, on brief pro se. Martha V. Gordon and Merrill & Broderick on brief for
appellees Centerpoint Bank, Philip M. Stone and Edward L. Hahn. W. Wright Danenbarger and Wiggin & Nourie on for appellees David
B. Salzman, Richard P. Demers, Michael J. Kenndey, Anthony J.
Frederick, Jr., Ronald H. Bogers, Donald J. Levasseur, Robert A.
Bellemore and G. Roy. Martha v. Gordon and Merrill & Broderick on brief for
appellants Centerpoint Bank, Philip M. Stone and Edward L. Hahn. W. Wright Danenbarger and Wiggin & Nourie on brief for
appellants David B. Salzman, Richard P. Demers, Michael J.
Kennedy, Anthony J. Frederick, Jr., Ronald H. Bogers, Donald J.
Levasseur, Robert A. Bellemore and Ronald G. Roy. L. Dickinson Bennett on brief pro se. __________________ __________________ Per Curiam. These matters involve (1) the plaintiff's
appeal from the district court's dismissal of his complaint,
which alleged that the defendants had violated the Racketeer
Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1961 et. seq., and (2) the defendants' appeal from the
district court's denial of their motion for sanctions under
Fed. R. Civ. P. 11. We will sketch the facts alleged in the
complaint; they are set forth in more detail in the district
court's order. Bennett v. Centerpoint Bank, 761 F.Supp. 908
(D.N.H. 1991). Bennett, along with his partners in Manchester Bank
Associates, set out to organize the Community National Bank
(CNB). They filed an application for a bank charter with the
federal Office of the Comptroller of the Currency (OCC),
appointed themselves interim directors of the nascent bank,
and solicited stock subscriptions from some 150 investors. In October 1989, the interim directors of CNB received an
offer from Centerpoint Bank, another embryonic banking
venture in Manchester, New Hampshire. The gist of
Centerpoint's proposal was that the market could bear one,
but not two, new banks. Centerpoint therefore offered to pay
CNB's interim directors either $200,000 or $250,000,
depending on the payment schedule, for (1) a non-competition
agreement and (2) certain intangible assets (defined as
"market research, consulting, services, etc."). In addition,
some of Centerpoint's directors would pay $25,000 for a share
of Manchester Bank Associates. As late as November 4, 1989,
CNB's interim directors, including Bennett, were unanimous in
their willingness to accept Centerpoint's offer. By the time
the non-competition agreement was ready for execution on
November 7, however, Bennett had soured on the deal, so that
only his co-directors actually signed the agreement and went
through with the transaction. They eventually received
$225,000 from Centerpoint, and several of them joined
Centerpoint's board of directors. According to Bennett, when his co-directors bolted from
CNB, they caused a "significant change" in CNB's plans, which
caused OCC (once Bennett had informed it of the change) to
require CNB to withdraw its application for a bank charter. Bennett duly (and unilaterally) withdrew the application. At
that moment, he alleges, CNB "ceased to exist as a body
corporate." This happened on November 8, 1989. Bennett claims that his former co-directors (the "CNB
defendants") along with Centerpoint and two of its officers
(the "Centerpoint defendants"), then embarked on the "pattern
of racketeering activity" that forms the basis of his civil
RICO complaint. Boiled down to its essence, the complaint
alleges that the defendants did the following: (1) They
misappropriated the list of CNB's stock subscribers. (2)
Using that list, they attempted to convince CNB's subscribers
to invest in Centerpoint, committing fraud on the subscribers
through a variety of affirmative misrepresentations and
material omissions. (3) They also asked OCC to delay the
return of the CNB subscribers' funds (which were being held
in an escrow account), and to allow them to transfer,
directly from the escrow account to Centerpoint, any money
that those subscribers agreed to re-invest in Centerpoint. (4) When Bennett asked OCC to deny this request, one of the
defendants, an officer of Centerpoint, made comments to
Bennett that he took as a threat to his safety and the safety
of his family. (5) The CNB defendants purported to meet as
CNB's board of directors (even though this meeting took place
after Bennett had withdrawn the application and ended CNB's
corporate life), and voted to remove Bennett as chairman of
the board. (6) The CNB defendants used the money they
received from Centerpoint to repay First Mutual Bank for
Savings, which had given them a loan to cover CNB's
organizational costs. In return, First Mutual released the
CNB defendants from their personal guarantees of the loan,
and dismissed them from a state court lawsuit it had
instituted to recover the debt. Neither Bennett nor CNB
received a release or a stipulation of dismissal. I Since Bennett has appealed a decision to dismiss his
complaint pursuant to Fed. R. Civ. P. 12(b)(6), our review
is plenary. We must accept the allegations in the complaint
as true and draw all reasonable inferences from them in the
plaintiff's favor, and we should not affirm the dismissal
"unless it appears beyond doubt that the plaintiff can prove
no set of facts in support of his claim which would entitle
him to relief." Miranda v. Ponce Federal Bank, No. 90-2214
(1st Cir., Oct. 29, 1991) (quoting Conley v. Gibson, 355 U.S.
41, 45-46 (1957)). We will, however, require the plaintiff
to have "set forth factual allegations, either direct or
inferential, respecting each material element necessary to
sustain recovery under some actionable legal theory." Gooley
v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988). Since
this is a civil RICO complaint, moreover, we will take
"particular care . . . to balance the liberality of the Civil
Rules with the necessity of preventing abusive or vexatious
treatment of defendants." Miranda v. Ponce Federal Bank,
supra. We will require the plaintiff to have stated, "at a
bare minimum, . . . facts sufficient to portray (i) specific
instances of racketeering activity within the reach of the
RICO statute and (ii) a causal nexus between that activity
and the harm alleged." Id. The district court dismissed the complaint for failure
to meet the second, causal nexus, requirement. In other
words, the district court ruled that Bennett lacked standing
to bring a civil RICO suit. 18 U.S.C. 1964(c) confers such
standing on "[a]ny person injured in his business or property
by reason of" a violation of the RICO statute. This standing
requirement actually has three elements. First, the
plaintiff's injury must be of the sort recognized by the
statute -- an injury to "business or property." Second, "the
conduct constituting the violation" -- either the pattern of
racketeering or one or more of its predicate acts -- must be
the actual cause of the plaintiff's injury. Sedima, S.P.R.L.
v. Imrex Co., Inc., 473 U.S. 479, 496 (1985). See also
Arzuaga-Collazo v. Oriental Federal Savings Bank, 913 F.2d 5,
7 (1st Cir. 1990) (plaintiffs did not state RICO claim when
they failed to make clear how alleged racketeering acts
injured their business or property). Actual causation alone,
however, "is insufficient to confer RICO standing . . . since
section 1964(c) establishes a proximate cause requirement as
well." Willis v. Lipton, No. 90-1930 (1st Cir., Oct. 28,
1991). "RICO liability is not to be extended without limit,
for 'some boundary must be set to liability for the
consequences of any act, upon the basis of some social idea
of justice or policy.'" Id. (quoting Sperber v. Boesky, 849
F.2d 60, 63 (2d Cir. 1988)). See also In re Crazy Eddie
Securities Litigation, 714 F.Supp. 1285, 1291 (E.D.N.Y. 1989)
("some practical boundary must be set . . . on the basis of
the objectives of the statute, the foreseeable consequences
of the acts, and their relationship to the loss claimed"). Proximate cause, therefore, is the third element of RICO standing. II We agree with the district court that the allegations in
the complaint do not give Bennett RICO standing. The
complaint is divided into forty-three counts, each of which
(save the last) alleges the commission of one or more
predicate acts. The last count alleges the RICO violation
itself. Each count contains some variation on the rote
incantation that the defendants' acts "injured" Bennett in
his "business or property." These bare allegations are
plainly inadequate. See Gooley v. Mobil Oil Corp., 851 F.2d
at 515. See also In re U.S. Grant Hotel Associates, Ltd.
Securities Litigation, 740 F.Supp. 1460, 1469 (S.D.Cal. 1990)
(conclusory allegations of injury resulting from predicate
acts do not create standing). Nor do the facts alleged in the complaint lend enough
content to Bennett's conclusions about injury and causation
to permit us to infer that he has RICO standing. In the
district court the parties argued about several "harms" that
the complaint described, either expressly or indirectly. On
appeal, however, Bennett focuses on a single area of alleged
"harm," the depletion of CNB's corporate assets. We note first that, with the exception of the
misappropriated subscriber list and the "intangible assets"
that the CNB defendants agreed to sell to Centerpoint,
Bennett's complaint does not identify any particular
corporate assets or describe how the defendants robbed those
assets of value. It seems to us that CNB's primary asset was
its corporate existence and its potential as a profitable
business -- in other words, not its current value but its
ability to acquire a value. Two events ended that existence
and erased that potential: the CNB defendants' decision to
accept Centerpoint's offer and sign a non-competition
agreement (a decision in which Bennett initially joined), and
Bennett's consequent withdrawal of CNB's application for a
bank charter. Neither event involved a predicate act of
racketeering within the definition of 18 U.S.C. 1961(1). The harm that flowed from those events, therefore, cannot be
remedied by a civil RICO suit. The statute "provides no
cause of action to individuals injured by acts other than
criminal RICO violations." Nodine v. Textron, Inc., 819 F.2d
347, 349 (1st Cir. 1987). Even if we assume that the defendants' predicate acts
did squander, to an unidentified extent, the value of certain
corporate assets, we do not see how the depletion of the
assets gives Bennett standing to bring a RICO suit. Bennett
does not, because he cannot, claim that he has a right to
recover personally for CNB's corporate injury. See Roeder v.
Alpha Industries, Inc., 814 F.2d 22, 29 (1st Cir. 1987) (RICO
suit for injuries to corporation can be brought only by
corporation or by shareholder suing derivatively on its
behalf). He argues, rather, that he can sue as an organizer
of the bank. The injury, in this theory, is tertiary. First
the defendants injured the corporation, eroding its ability
to pay its debts. This prevented the bank's creditors from
enjoying a recovery they might otherwise have obtained from a
healthier debtor. Bennett, as an organizer of the venture,
bore a responsibility, imposed by federal regulation, to pay
the costs associated with an unsuccessful organization. See
12 C.F.R. 16.7(c). An injury to the bank's creditors,
therefore, was an injury to him. See Mid-State Fertilizer
Co. v. Exchange National Bank, 877 F.2d 1333, 1336 (7th Cir.
1989) ("[g]uarantors are contingent creditors"). All this may be true, but it begs the essential
question: whether a corporation's creditors have standing to
sue under RICO for an injury caused by the depletion of the
debtor corporation's assets. A number of courts have said
that they do not. See, e.g., Mid-State Fertilizer Co. v.
Exchange National Bank, 877 F.2d at 1335-36; National
Enterprises, Inc. v. Mellon Financial Services Corp., 847
F.2d 251, 254-55 (5th Cir. 1988); Wooten v. Loshbough, 738
F.Supp. 314 (N.D.Ind. 1990); Dana Molded Products, Inc. v.
Brodner, 58 B.R. 576, 580-81 (N.D.Ill. 1986). These cases, it is true, are predicated to a greater or
lesser extent on a distinction between "direct" and
"indirect" injuries. We have expressly declined to recognize
that distinction as a proximate cause boundary in civil RICO
cases. See Bass v. Campagnone, 838 F.2d 10, 11 (1st Cir.
1988); Roeder v. Alpha Industries, Inc., 814 F.2d at 29. We
have said that the proper inquiry is "not whether the
plaintiff has alleged a direct or indirect injury, but rather
whether he or she has alleged an injury that 'flows from' the
predicate acts." Bass v. Campagnone, 838 F.2d at 12. The rationale of our decisions in Roeder and Bass,
however, also bars Bennett's claim. In Roeder, for example,
we ruled that a corporation's involvement in illegal
activities can damage the value of its stock, and therefore
cause an indirect injury to its shareholders, and that the
indirect nature of the injury is itself no obstacle to a suit
by an individual shareholder. 814 F.2d at 29. Nevertheless,
we held that a RICO suit for such injuries could only be
brought by the corporation, or by a shareholder suing
derivatively on behalf of the corporation. Id. This was
because the alleged injury to the individual plaintiff --
that is, the decline in value of the plaintiff-shareholder's
stocks -- "merely reflects the decrease of the value of the
firm." Id. at 30. An individual shareholder could not bring
a personal RICO action to recover for this injury to the
corporation "without impairing the rights of prior claimants
to such assets." Id. (quoting Rand v. Anaconda-Ericsson,
Inc., 794 F.2d 843, 849 (2d Cir. 1986)). The analysis is no different when the individual
plaintiff is a creditor or a guarantor. A creditor, like a
shareholder, possesses an interest in the firm, the value of
which is dependent on the value of the firm itself. The
creditor's loss, like the shareholder's loss in Roeder,
"merely reflects the decrease in the value of the firm"
caused by the defendant's racketeering. An individual
creditor, like an individual shareholder, cannot obtain
relief without interfering with the ability of other
creditors (and shareholders) to do so as well. As the
Seventh Circuit has noted, since we already "allow the
corporation to litigate in its own name and collect the whole
sum," Mid-State Fertilizer Co. v. Exchange National Bank, 877
F.2d at 1336, to allow individuals who hold rights in the
corporation to recover personally for their derivative
injuries would be to authorize "a form of double-counting."
Id. at 1335. If the injury to the corporation is $100, and
the injury to each of its two shareholders (or creditors)
$50, allowing the corporation to recover for the entire
injury, and the shareholders or creditors to recover
personally for their injuries, would force the defendant to
pay double the damages he has caused. The alternative -- a
system that somehow allocated recovery between the
corporation and any individual plaintiffs -- would be a
procedural "nightmare." Id. We will assume, as Bennett asserts, that the
"corporation" here no longer exists and therefore may be
incapable of suing to redress the collective wrong. But this
does not automatically entitle Bennett to bring a lawsuit
that would otherwise belong to the defunct bank. In Bass v.
Campagnone, we held that where the "corporate" entity (in
that case, a labor union), cannot or will not sue, and a
derivative action is not available, an individual plaintiff
has standing only if he sues on behalf of the entire class of
people whose interest in the entity was affected by the
defendant's wrongs -- that is, in this case, on behalf of all
of CNB's creditors. 838 F.2d at 13. Bennett's complaint
asserts no interests but his own. In both Roeder and Bass we acknowledged an exception to
this general standing requirement. One who holds rights in
the injured entity -- whether a shareholder as in Roeder, a
union member as in Bass, or a creditor as here -- may recover
personally if the injury to his or her interest is "peculiar
to him alone, and does not fall alike upon other
[shareholders, union members or creditors]." Roeder, 814
F.2d at 30. See also Ashland Oil, Inc. v. Arnett, 875 F.2d
1271, 1280 (7th Cir. 1989) (particular creditors may sue
where facts show injury "significantly different from
injuries to creditors in general"); Bass v. Campagnone, 838
F.2d at 12, 13. Bennett's claims of injury as an organizer/creditor,
however, are grossly inadequate to the task of showing a
"peculiar" injury. Bennett has alleged only that "various
creditors" of the Bank "are unpaid," while "others" have
filed claims in excess of $1,400,000. According to Bennett,
those creditors have "looked to" Bennett, "among others," for
payment. This allegation has two defects. First, it does not
identify an "injury" traceable to racketeering activity. The
organizers' obligation to satisfy CNB's creditors arose when
the banking venture failed, leaving debts behind. But that
event, as we have said, was not a consequence of the
defendants' predicate acts. And neither, as far as we can
tell on the basis of the facts alleged, were those debts. The defendants' racketeering would have caused an injury only
if it forced the organizers to pay the creditors more than
they would have needed to pay had the venture simply failed
and no racketeering activity occurred. With one possible
exception, however, Bennett tells us absolutely nothing about
how the defendants' predicate acts depleted CNB's assets and
left its organizers on the hook for a debt that would
otherwise have been satisfied by the company. The complaint also fails to identify an injury that is
"peculiar" to Bennett among the organizers. The federal
regulation he cites, making bank organizers liable for the
costs of organization, applies to organizers in general. The
complaint (again, with one possible exception) does not
suggest that Bennett's former partners (and current
adversaries) are any less liable to CNB's creditors than he
is. Indeed, the statement that the creditors have looked to
Bennett, "among others," for satisfaction, suggests that the
creditors have not sought to impose any special obligations
on Bennett. The sole possible exception is Bennett's allegation that
the CNB defendants obtained releases from their personal
guarantees to First Mutual and stipulations of dismissal from
First National's debt collection suit, but obtained no relief
for Bennett or CNB. If one accepts (1) that this act
qualified as a predicate act of racketeering, (2) that the
$225,000 the CNB defendants obtained from Centerpoint
represented the value of assets that should properly have
remained with the company, and (3) that the payment to First
Mutual did not completely satisfy the organizers' debt, one
could infer from the complaint, we suppose, that Bennett,
alone among CNB's organizers, is now exposed to collection
efforts for the remainder of the debt to First Mutual. But
exposure does not equal injury: there is nothing in the
complaint to suggest that First Mutual has actually pursued
its lawsuit or any other action against Bennett alone, and
certainly nothing to suggest that it has done so to the point
of settlement or judgment. In other words, there is nothing
in the complaint to say or suggest that Bennett has paid
First Mutual anything, much less that he has paid it more
than he would have paid if the defendants had never committed
a predicate act. The injury, therefore, is speculative and
the suit, at the very least, premature. See Bankers Trust
Co. v. Rhoades, 859 F.2d 1096, 1102-03 (2d Cir. 1988) (until
injury occurs, there is no right to sue under RICO); Arabian
American Oil Co. v. Scarfone, 713 F.Supp. 1420, 1421
(M.D.Fla. 1989) ("potential exposure" insufficient to satisfy
injury requirement); Abraham v. Marist College, 706 F.Supp.
294 (S.D.N.Y. 1989) (possibility that plaintiff might be
denied government grant); Anitora Travel, Inc. v. Lapian, 677
F.Supp. 209, 216 (S.D.N.Y. 1988); Jones v. Baskin, Flaherty,
Elliot and Mannino, P.C., 670 F.Supp. 597, 599 (W.D.Pa. 1987)
(possibility of future tax prosecution). III We need not linger over the defendants' cross-appeal. The district court ruled that Bennett had not violated Rule
11 since he had "made a reasonable effort to find legal
support for his theory of standing." 761 F.Supp. at 918. We
would disturb that conclusion only if it was an abuse of the
district court's discretion, Kale v. Combined Insurance Co.,
861 F.2d 746, 756-58 (1st Cir. 1988), and we find no such
error here. Rule 11 imposes a test of "objective
reasonableness under the circumstances existing at the time." Id. at 758. The circumstances here include (1) Bennett's pro
se status, see Thomas v. Evans, 880 F.2d 1235, 1240 (11th
Cir. 1989), (2) the absence of any First Circuit precedent on
the specific standing issue raised by his complaint, see
Winstead v. Indiana Insurance Co., 855 F.2d 430, 435 (7th
Cir. 1988), and (3) this court's rejection of the distinction
(between direct and indirect injuries) upon which other
courts had based their decisions to deny RICO standing to
corporate creditors injured by harms inflicted on the debtor
corporation. Taking those circumstances into account, we
would be hard put to conclude that the district court erred
in ruling that Bennett had a good faith, though ultimately
ineffective, "argument for the extension . . . of existing
law," Fed. R. Civ. P. 11, much less that the district court
abused its discretion in so ruling. Affirmed.