ZEE–BAR, INC.—N.H., et al.

v.

Gerald N. KAPLAN, et al.

Civ. No. 88–60–D.

United States District Court,
D. New Hampshire.

May 15, 1992.

Phyllis McCoy, Rutland, Vt. and Randolph Reis, Manchester, N.H., for all plaintiffs.

Warren Nighswander, Concord, N.H., for Kaplan & Shuman and Stanley L. Shuman.

James Bassett, Concord, N.H., for Gerald Kaplan, and Lynne C. Norton.

## ORDER

DEVINE, Chief Judge.

In this consolidated civil action, individual plaintiff Robert Zabarsky and corporate plaintiffs Zee–Bar, Inc.—N.H.; T & Z Realty, Inc.; R.Z., Inc.; and Zee–Bar, Inc., of Vermont seek damages for alleged violations of the civil Racketeer Influenced and Corrupt Organizations (RICO) statute by defendants Gerald N. Kaplan, Stanley L. Shuman, and Lynne C. Norton. Plaintiffs also assert violations of New Hampshire's Consumer Protection Act, fraud, and negligence by defendants Kaplan and Kaplan and Shuman, C.P.A. ("K & S").[1]

---

1. This action was originally filed in February 1988 ("the 88–60 complaint"). In 1989 the RICO counts and the fraud count were dismissed. Subsequently, the fraud count was reinstated. Plaintiffs reasserted the RICO claims against defendant Kaplan (Count I), against defendant Kaplan while he was a partner in K & S (Count II), and against defendants Norton and Shuman (Count III) ("the 89–401 complaint"). The two actions were then consolidated. Plaintiffs have since dropped the claims against Norton and Shuman.

Presently before the court are three motions: (1) motion of defendant K & S to dismiss all claims against it for lack of subject matter jurisdiction; (2) motion of defendants Kaplan and K & S to dismiss plaintiffs' Consumer Protection Act claim; and (3) motion of all defendants for summary judgment on the RICO claims. The pertinent facts of this controversy follow.[2]

## Background

In 1971 Robert Zabarsky hired Gerald Kaplan, his first cousin, to provide accounting services for his corporation, R.Z., Inc. Prior to that time, Mr. Kaplan had earned his MBA in accounting and was an accountant certified by the Commonwealth of Massachusetts. As Mr. Zabarsky expanded his enterprise, Mr. Kaplan advised him in the creation of plaintiff corporations Zee–Bar, Inc.—N.H. and T & Z Realty, assuming the responsibility of the accounting duties for each.

Mr. Kaplan entered into a partnership with defendant Stanley L. Shuman on November 1, 1983. As a partner in K & S, Mr. Kaplan continued his role as accountant for all of the plaintiffs.

The relationship between Zabarsky and Kaplan began to sour in early August 1985. On August 16, after several weeks passed during which Kaplan avoided Zabarsky's frequent telephone calls, Kaplan resigned from his position, notifying Zabarsky of this turn of events via mailgram. Upon Kaplan's resignation, Zabarsky requested his files. A portion of these were delivered to him days later by Lynne Norton, the office manager of K & S. The balance of the files, including checking account statements and canceled checks, were returned in June 1986. Subsequent perusal of these files led to the allegations upon which this dispute is based.

Plaintiffs allege a web of neglect, deceit, and fraud. Federal and state tax returns in many instances were filed late, and at times not at all. And on several occasions, Kaplan signed Zabarsky's name to the returns filed. Kaplan controlled Zabarsky's and the corporations' check books, and paid, with plaintiffs' funds, bills which plaintiffs did not incur. Kaplan paid himself with those funds for services which he had not performed and billed plaintiffs for preparation of tax returns not filed. Upon a request to reduce a balance in question, Kaplan diverted funds requested from Zabarsky to a mutual fund money market account in his name. Finally, both Kaplan and Shuman let their licenses lapse, and were unlicensed practicing CPAs from 1983 to 1986.

## Motions to Dismiss

In considering a Rule 12 motion to dismiss, the issue the court must address is whether, based on the claims contained in the complaint, the plaintiff is entitled to offer evidence. *V.S.H. Realty v. Texaco*, 757 F.2d 411, 414 (1st Cir.1985) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). The court's consideration is limited to the allegations contained within the complaint, *Litton Indus. v. Colon*, 587 F.2d 70, 74 (1st Cir.1978), and those allegations are to be "construed in the light most favorable to plaintiff and taken as admitted, with dismissal to be ordered only if the plaintiff is not entitled to relief under any set of facts he could prove," *Chasan v. Village Dist. of Eastman*, 572 F.Supp. 578, 579 (D.N.H. 1983) (and citations therein), *aff'd without opinion*, 745 F.2d 43 (1st Cir.1984); *see also Knight v. Mills*, 836 F.2d 659, 664 (1st Cir.1987). This is not to say that an erstwhile plaintiff has unfettered discretion; the court is not required to give weight to "bald assertions, unsupportable conclusions, or opprobrious epithets." *Royal v. Leading Edge Prod.*, 833 F.2d 1 (1st Cir. 1987) (citing *Chongris v. Board of Appeals*, 811 F.2d 36, 37 (1st Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987)).

**2.** The facts recited herein are taken from the various pleadings, motions, and replies found in the record.

*Motion of Defendant K & S to Dismiss (document no. 64)*

The thrust of this motion is that the movant, a New Hampshire partnership with only two partners, lacks the capacity to be sued.

Rule 17(b), Fed.R.Civ.P., mandates that the "capacity to sue or be sued shall be determined by the law of the state in which the district court is held...." In the event that "a partnership or other unincorporated association" has no capacity to sue or be sued under that state's law, the rule provides that that entity "may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States...." *Id.*

All parties concur that pursuant to this rule New Hampshire law determines whether K & S may be sued as an entity, separate from its partners, on the state law claims of violation of the Consumer Protection Act, fraud, and negligence. It is K & S's position, however, that under New Hampshire law a partnership is subject to suit only in instances where the partnership has more than four partners.

To support the premise that it lacks capacity for suit, defendant partnership relies on New Hampshire Revised Statutes Annotated (RSA) 510:13, which states:

> **510:13 Associations.** Service of writs or other process against unincorporated associations, joint stock companies, syndicates, orders or any mutual association of persons, other than a partnership having not more than 4 members, within this state may, except when otherwise provided, be made upon any officer thereof, or, if it has no officer, then upon any 2 members thereof.

As further support, K & S cites *Rosenblum v. Judson Eng'g Corp.*, 99 N.H. 267, 109 A.2d 558 (1954), which summarized relevant New Hampshire partnership law at that date as follows:

> In this state, a partnership is 'a relation or status between individuals.' *Sulloway v. Rolfe*, 94 N.H. 85, 87 [47 A.2d 109]. Where it has not more than four members, it is not itself subject to suit in

the firm name. (R.L. c 387, s. 14) but the action must be brought against the partners individually (Restatement, Conflict of Laws, s. 86, comment a; *see Kaffenberger v. Kremer*, 63 F.Supp. 924), and they must be served individually (*Matson v. Mackubin*, 57 F.(2d) 941) [D.C.Cir.] except when otherwise specifically authorized (supra s. 14).

*Id.* at 269, 109 A.2d 558.

This view was reiterated in *Donald Manter Co. v. Davis*, 543 F.2d 419 (1st Cir. 1976). Citing RSA 510:13, the First Circuit stated, "New Hampshire law ... treats partnerships as entities subject to suit in their own name only when there are more than four partners; otherwise the partners must be sued individually." *Id.* at 420 (citation omitted) (citing *Judson, supra*).

Plaintiffs argue that under the Uniform Partnership Act (UPA), adopted by the New Hampshire Legislature in 1973 and codified as RSA 304–A, a partnership may be sued as an entity by any individual who is not a partner. The basis of this argument lies in the language of RSA 304–A:13.

> **Partnership Bound by Partner's Wrongful Act.** Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his co-partners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

Taking as their cue "the partnership is liable", plaintiffs first contend that *Judson* is inapplicable because it was decided twenty-two years before the adoption of the UPA. Next, while acknowledging *Manter*'s reliance upon RSA 510:13, plaintiffs argue that the court there failed to address the applicable provisions of the UPA, and instead looked only to *Judson*. Citing other jurisdictions which have interpreted the UPA as enabling a partnership to be sued as an entity, plaintiffs contend that had the Legislature intended to limit partnership liability to partnerships consisting of more

than four members, it would have included that restriction in the statute.

Finally, plaintiffs find no inconsistency between the UPA and RSA 510:13 because the latter is concerned solely with service of process, not the issue of partnership liability. There is no logical basis, plaintiffs conclude, for authorizing suit against a partnership of five partners and not against a partnership of four.

Plaintiffs are correct in their assessment that RSA 510:13 is concerned solely with process. As such, that statute has little to do with the issue at hand. *See Shortlidge v. Gutoski*, 125 N.H. 510, 484 A.2d 1083 (1984) (RSA 510:13 relieves a plaintiff of the task of having to name and personally serve process on each and every partner). The UPA, however, as applied in New Hampshire, appears no more helpful to plaintiffs. Under New Hampshire law, "[t]he Uniform Partnership Act does not make a legal partnership an independent juristic entity, and whatever recognition is given therein to the entity theory is solely for procedural or conveyancing purposes." *Swiezynski v. Civiello*, 126 N.H. 142, 146, 489 A.2d 634 (1985) (quotations and citations omitted). *See also Mercier v. Saber, Inc.*, 888 F.2d 1459, 1461–62 (1st Cir.1989). *Cf. Tanguay v. Marston*, 127 N.H. 572, 576, 503 A.2d 834, 836 (1986).

The New Hampshire Supreme Court's review of the UPA in *Swiezynski* is instructive.

> The UPA commingles the entity theory, which regards a partnership as an independent legal entity, with the aggregation theory, which holds that a partnership has no such independent status....
>
> A partnership is not considered an entity separate from its members, except in limited circumstances. *See Sonberg v. Bergere*, 220 Cal.App.2d 681, 682, 34 Cal. Rptr. 59, 60 (1963); *Carlson v. Carlson*, 346 N.W.2d 525, 526–27 (Iowa 1984); *Candler v. Hardware Dealers Mut. Ins. Co.*, 57 Wis.2d 85, 87–88, 203 N.W.2d 659, 660 (1973). The entity theory gov-

erns only in matters of procedure, *see, e.g.*, RSA 304–A:11, :12, :27, :28, :30 (Supp.1981), and in the holding and conveyancing of property, *see, e.g.*, RSA 304–A:10, :24 to :26 (Supp.1981), including the marshalling of assets.

> The aggregation theory controls in matters relating to the substantive liabilities and duties of the partners.

*Id.*, 126 N.H. at 146–47, 489 A.2d at 638–39 (citations omitted).

Based on the foregoing, the court finds that K & S has no identity as a separate entity subject to suit. The defendant partnership's motion to dismiss is granted.

*Defendants' Motion to Dismiss Count III*

In Count III, plaintiffs assert that defendant Kaplan[3] violated the New Hampshire Consumer Protection Act ("the Act"), RSA 358–A (Supp.1990), by representing himself as a licensed certified public accountant from 1983 to 1986, a period during which his license had lapsed.

The fact that Kaplan was not licensed is actionable under RSA 358–A:2 II and III, which provides,

> **358–A:2 Acts Unlawful.** It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state. Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to, the following:
>
> .　　.　　.　　.　　.
>
> II. Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> III. Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another; ....

Kaplan's motion to dismiss is grounded in section A:3 of the Act, which reads in relevant part,

---

**3.** Because all claims have been dismissed against the partnership, Kaplan is the lone defendant with regard to Count III.

**358–A:3 Exempt Transactions; etc.**
The following transactions shall be exempt from the provisions of this chapter:

I. Trade or commerce otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of this state or of the United States; .. .

. . .. . . .

IV–a: Transactions entered into more than 2 years prior to the complaint; provided, however, that this section shall not ban the introduction of evidence of unfair trade practices and deceptive acts prior to the 2 year period in any action under this chapter.

Kaplan resigned as plaintiffs' accountant on August 16, 1985. Because plaintiffs' complaint was filed on February 17, 1989, Kaplan argues that RSA 358–A:3 IV–a specifically exempts the Consumer Protection Act claims.

In the alternative, Kaplan contends that under section I, accountants are exempt from the scope of the act because their profession is regulated by a Board of Accountancy, RSA 309–A:2–a. As will be shown, the court agrees that defendant's alleged actions are exempt under RSA 358–A:3 IV–a. Therefore, the merits of the alternate claim need not be addressed.

Plaintiffs contend that the two-year period should be tolled until such time as they knew or should have known that they were injured by Kaplan's wrongful act. According to the complaint, plaintiffs were not aware that Kaplan was not licensed until notice was received from the Commonwealth of Massachusetts Board of Public Accountancy in April of 1986. It would have been impossible, plaintiffs argue, to have filed the complaint within the non-exempt time; therefore, they conclude, their claims should not be barred.

In New Hampshire, limitations periods have been modified under two sets of circumstances. In one, the limitations period will not begin to run until such time as plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the defendant's acts. RSA 508:4. *See also University System of N.H. v. United States Gypsum*, 756 F.Supp. 640, 647–48 (D.N.H.1991). Secondly, the limitations period will be tolled whenever the defendant has fraudulently concealed from the plaintiff that he has a cause of action. *Thomas v. King Ridge, Inc.*, 771 F.Supp. 478, 481 (D.N.H.1991).

These exceptions have not been applied to all classes of cases, however. For example, New Hampshire has yet to extend the discovery rule to all contract actions. *Cheshire Medical Center v. W.R. Grace & Co.*, 764 F.Supp. 213, 217 (D.N.H.1991). New Hampshire has, however, established an exception for fraudulent concealment in actions under the New Hampshire Uniform Commercial Code ("the Code"). *Id.;* RSA 382–A:2–725, comment 3 (citing *Hamlin v. Oliver*, 77 N.H. 523, 93 A. 966 (1915)).

With respect to the statute here at issue, the court first notes that the time limitation at issue is styled as an "exemption" rather than a statute of limitation. Moreover, unlike, as noted above, the Code, the Act is silent on the issues of discovery and concealment. *See id. See also* RSA 382–A:2–725(2) (cause of action accrues at time of breach, regardless of knowledge thereof).

With respect to the Act, only one decision has spoken to the particular issue raised herein. In *City of Manchester v. National Gypsum Co.*, 637 F.Supp. 646 (D.R.I.1986), the court[4] rejected application of the above-referenced tolling doctrines to the Act. As relevant herein, Senior District Judge Pettine stated,

> The transactions at issue in this suit occurred no later than 1975, eight years before the complaint was originally filed. The plain wording of the statute, thus, forecloses the plaintiff's recovery on this theory of relief. The plain wording of the provision also forecloses application of the usual rules for tolling of statutes of limitations, i.e., the discovery and fraudulent concealment rules; the provi-

---

**4.** The action was originally removed to this court, but was transferred upon recusal of both

New Hampshire federal district judges then sitting.

sion explicitly 'exempts' 'transactions' entered into more than two years prior to the complaint. Further, the nature of the Act, applying as it does to unfair and deceptive acts and practices, is such that the legislature would be aware of problems of discovery and fraudulent concealment and would have worded the statute differently if it sought to have such rules apply to this statute.

Finally, I must reject the plaintiff's argument that it is entitled to have a jury consider whether or not the defendants' conduct constituted an unfair or deceptive trade practice. The City argues that the second sentence of the exemption permits introduction of evidence even if occurring more than two years prior to the date of the Complaint. However, evidence of acts occurring more than two years prior to the date of the Complaint can be introduced *only* if the plaintiff can first avoid the statutory exemption; it can only be introduced as evidence of a pattern of conduct in a suit properly brought under the Act.

*Id.* at 655–56.

Plaintiffs' criticisms of Judge Pettine's decision notwithstanding, this court is of the opinion that he is correct. In addition, there is a broader policy that counsels against tolling the statutory exemption period. As the First Circuit has recently stated,

It was the plaintiff who bypassed the state courts in favor of selection of a federal forum. We have warned, time and again, that litigants who choose to sue in a federal court ... cannot realistically expect the federal court to open new state-law frontiers.

*DCPB, Inc. v. City of Lebanon,* 957 F.2d 913, 915 (1st Cir.1992) (citations omitted).

Where, as here, New Hampshire courts have applied the relevant tolling doctrines in some situations but not others, this court will not do so in a Consumer Protection Act case in the absence of state precedent.[5]

Accordingly, defendant's motion to dismiss Count III of the complaint in Civil Action 88–60–D is granted.

*Defendants' Motion for Summary Judgment on RICO Claims in C. 89–401–D Complaint*

Before addressing the instant motion for summary judgment, it is worthwhile to set forth the procedural history of these RICO claims. As noted, plaintiffs filed two counts of RICO violations on February 17, 1988, against defendants Kaplan, Shuman, and Norton. On June 21, 1989, this court affirmed an earlier order dismissing those counts on defendants' motion to dismiss for failure to state a claim under RICO. It was the opinion of this court at that time that plaintiffs had failed to allege a "pattern of racketeering activity" as required by the statute, 18 U.S.C. § 1962(c). Order dated June 21, 1989, at 9.

Plaintiffs filed substantially the same, although more detailed, RICO claims on August 17, 1989, relying on the unanimous United States Supreme Court decision, *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). This court had cause to reconsider the viability of those claims upon defendants' motion to strike the pleadings. Reviewing the claims in light of *H.J., Inc., supra,* and *Fleet Credit Corp. v. Sion,* 893 F.2d 441 (1st Cir.1990), the court found that plaintiffs had alleged at least two predicate acts which fit within the statutory definition of racketeering activity, demonstrated the relationship between the acts, and demonstrated that they posed a threat of continued criminal activity and thereby withstood the motion to dismiss. Order dated January 12, 1990, at 7.

These claims are once against subject to consideration on defendants' motion for summary judgment, which asserts (1) that plaintiffs have failed to state causes of action under RICO; (2) in the alternative, that these claims are barred by the four-year statute of limitations imposed upon

---

5. The cases from other jurisdictions cited by plaintiffs in support of application of the discovery rule are inapposite. The relevant statutes in those jurisdictions are all either styled as traditional statutes of limitations—as opposed to exemptions—or contain their own "discovery rule" provisions. Such is not the case in New Hampshire.

RICO actions; and, finally, (3) that Zee–Bar of Vermont, as successor to the three New Hampshire corporate plaintiffs, has no standing because it suffered no injury. These claims are addressed in order.

*Summary Judgment*

The role of summary judgment is " 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to " 'show that there is no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law,' " *id.* (quoting Rule 56(c), Fed.R.Civ.P.), and the court must view the entire record in the light most favorable to the nonmovant, " 'indulging all reasonable inferences in that party's favor,' " *id.* (quoting *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990)). However, once the moving party has made a properly supported motion for summary judgment, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citing Rule 56(e), Fed. R.Civ.P.); *see also Mesnick, supra,* 950 F.2d at 822 ("Not every discrepancy in the proof is enough to forestall a properly supported motion.").

*Civil RICO*

As provided in 18 U.S.C. § 1962(c),

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In short, "[t]o establish a violation of 1962(c), a plaintiff must show that the defendant(s) 'engaged in (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity....' " *Lincoln House, Inc. v. Dupre,* 903 F.2d 845, 846 (1st Cir. 1990) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted)).

"Racketeering activity" is defined "as any act which is indictable" under numerous provisions of Title 18, including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). 18 U.S.C. § 1961(1)(B).

A plaintiff successful in establishing a "pattern of racketeering activity ... must show at least two predicate acts of racketeering activity and must establish that the 'predicates are related, *and* that they amount to or pose a threat of continued criminal activity.' " *Lincoln House, supra,* 903 F.2d at 846 (quoting *H.J., Inc., supra,* 492 U.S. at 237, 109 S.Ct. at 2899, and *Fleet Credit Corp., supra,* 893 F.2d at 444) (emphasis in original).

■ Having met these requirements, a plaintiff has standing only if an injury was suffered as a result of the racketeering activity. 18 U.S.C. § 1964(c). *Sedima, supra,* 473 U.S. at 496, 105 S.Ct. at 3285. Damages recoverable must flow from the commission of the predicate acts. "Causation is therefore a requisite element for standing under civil RICO." *Bennett v. Centerpoint Bank,* 761 F.Supp. 908 (D.N.H.), *aff'd,* 953 F.2d 634 (1st Cir.1991).

■ Finally, civil RICO actions are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley–Duff & Assoc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). Success on the merits entitles the prevailing party to treble damages, costs, and reasonable attorney's fees. 18 U.S.C. § 1964(c).

*Count I*

The racketeering activity alleged in Count I occurred from 1976 through November 1, 1983, before Kaplan was in partnership with Stanley Shuman. Plaintiffs claim that throughout this time, Kaplan: (1) used the mails and wires to send to each plaintiff fraudulent bills for work that was never done, Complaint ¶ 191; (2) used the mails and wires to request funds from Zabarsky which Kaplan then diverted (incorporated by reference), Complaint ¶¶ 24, 186, Plaintiff's Memorandum in Support of

Objection to Defendants' Motion for Summary Judgment at 16, Affidavit ¶ 6; (3) used the mails to file federal corporate income tax returns and New Hampshire Business Profits Tax returns which Kaplan had signed as "Robert Zabarsky, Pres." or as "Robert Zabarsky, President", Complaint ¶¶ 139–42, 192; and (4) utilized the interstate banking system to pay bills and expenses not attributable to the plaintiffs, Complaint ¶ 192.

Kaplan, in response, asserts that Zabarsky and the corporations allege far fewer predicate acts than garden-variety fraud. What predicate acts exist, he contends, are too few in number to reach a pattern of racketeering activity directed toward each individual plaintiff, thereby failing as a cause of action. He also contends that some claims fail for lack of injury, while others fail for lack of the particularity required by Rule 9(b), Fed.R.Civ.P.[6] For these reasons, he argues, summary judgment should be granted.

The majority of these allegations do fail as RICO predicate acts, and they fail for a variety of reasons. Each of the allegations will be addressed in turn.

The charge that defendant Kaplan used the mails to send fraudulent bills is without evidentiary support. In fact, Zabarsky admitted that he received no bills from Kaplan during the period encompassed in Count I.[7] Plaintiffs provide nothing in rebuttal; accordingly, there is no dispute about the non-existence of this particular predicate act.

Plaintiffs allege, and Kaplan does not deny, that he signed the following four tax returns as "Robert Zabarsky, Pres." or "Robert Zabarsky, President": R.Z., Inc.'s federal corporate return for fiscal year ending March 31, 1981; its New Hampshire Business Profits Tax return for the same

period, as well as for fiscal year ending March 31, 1980; and T & Z Realty, Inc.'s New Hampshire Business Profits Tax return for fiscal 1979. Mailing these returns to the respective taxing authorities, plaintiffs argue, supplies the element required for indictment under the mail fraud statute.

■ In defense, Kaplan first asserts that because the statute requires two predicate acts, and T & Z Realty, Inc., alleges only one instance in which Kaplan signed Zabarsky's name, it has not stated a case of action. This approach, which would deny standing in instances where a plaintiff suffers injury by only one act in the pattern of racketeering, is not in accordance with the consensus of the circuits. *See Town of Kearney v. Hudson Meadows Urban Renewal*, 829 F.2d 1263 (3d Cir.1987) ("[r]eading into the statute a requirement that a civil plaintiff prove injury from the entire pattern rather than from any predicate act would, we believe, be inconsistent with the core Congressional purpose behind its enactment"); *Hecht v. Commerce Clearing House*, 897 F.2d 21, 23 (2d Cir.1990) ("Because a plaintiff must show injury by the conduct constituting the violation of RICO [citations omitted], the injury must be caused by a pattern of racketeering activity violating section 1962 or by individual RICO acts"). *See generally* D. Smith & T. Reed, *Civil RICO* § 6.04 (1992). Furthermore, the First Circuit has held that the standing requirement is met if the plaintiff suffers an injury that "flows from" predicate acts. *Bass v. Campagnone*, 838 F.2d 10 (1st Cir.1988) (citing *Sedima, supra*, 473 U.S. 479, 105 S.Ct. 3275, and *Roeder v. Alpha Systems, Inc.*, 814 F.2d 22, 29 (1st Cir.1987)).

■ More compelling, however, is defendant's argument that no injury flowed

---

**6.** Rule 9(b), Fed.R.Civ.P., states:
 In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

**7.** Q. And is my understanding correct of what you have just testified to that be-

tween '75 and the fall of '83, you did not receive any bills from Mr. Kaplan, is that correct.
 A. I don't believe I did, no.
Defendants' Memorandum of Law Supporting Defendants' Motion for Summary Judgment at 18, Exhibit A at 32.

from Kaplan's alleged forgeries. While forgery arguably is part of a scheme to defraud, defined by the statute to "include[ ] a scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, the lack of the requisite injury makes it unnecessary to determine whether the mailing of the return qualifies this act as mail fraud.

Civil RICO requires that the racketeering activity be the proximate cause of the injury. *Willis v. Lipton*, 947 F.2d 998, 1000 (1st Cir.1991) ("Mere 'cause in fact' is insufficient to confer RICO standing, however, since section 1964(c) establishes a proximate cause requirement.") (citing *Hecht, supra*, 897 F.2d at 23 (distinguishing between "cause in fact" or "but for" causation and proximate cause)).

Plaintiffs contend that, as a result of Kaplan's alleged forgery, tax penalties were incurred. Rather than as a result of the forgery, however, it is apparent that the penalties were incurred as a result of late filing. Kaplan may have forged the returns to cover negligence in providing accounting services, but it is that negligence, and not the forgery, from which the injury flows. Plaintiffs acknowledge this, complaining of the "incurrence of tax penalties due to Kaplan's neglect of accounting duties," Complaint ¶ 24, and that "[t]he defendant misrepresented himself on income tax returns which he filed on my behalf and on behalf of the corporations in order to conceal the fact that he had, as a result of his own inattention and neglect, incurred tax penalties...." Zabarsky Affidavit ¶ 8. Simply put, the forgery was not the proximate cause of the injurious tax penalties. For this reason, plaintiffs have no standing to rely on defendant's forgery to support this action. *Bennett, supra.*

■ The allegation that defendant Kaplan utilized the mails and wires in his request for additional funds, which were then misappropriated, fails for the particularity required by Rule 9(b), Fed.R.Civ.P. *See supra* note 5. The dates and contents of no telephone conversations are provided, nor are specific mailings cited. Plaintiffs assert that "by virtue of their position, [they are unable] to specify precisely which of the mailings were sent for the purpose of acquiring funds for misappropriation." Plaintiffs' Memorandum at 16. Instead, plaintiffs simply supply several items of correspondence from Kaplan to Zabarsky and suggest that this "correspondence, as a whole, serves as evidence that Defendants did utilize the mails to perpetrate a fraud upon the Plaintiffs." *Id.*

"In RICO, the plaintiff must go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communication." *Fleet Credit Corp., supra*, 893 F.2d at 445 (citing *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 291 (1st Cir.1987)). This the plaintiffs have not done. The First Circuit, however, requires a second inquiry before a claim may be dismissed for lack of specificity.

In an appropriate case, where, for example, the specific allegations of the plaintiff make it likely that the defendant used interstate mail or telecommunications facilities, and the specific information as to use is likely in the exclusive control of the defendant, the court should make a second determination as to whether the claim as presented warrants the allowance of discovery and if so, thereafter provide an opportunity to amend the defective complaint.

*New England Data Services, supra*, 829 F.2d at 290. Plaintiffs first brought these complaints over five years ago. Moreover, Zabarsky personally destroyed many of the original financial and accounting documents. Defendants' Memorandum at 8, Exhibit A at 28–32. Providing additional time will bear no fruit, and therefore this allegation, too, fails as the source of predicate acts.

■ More troublesome to Kaplan, at least in part, are those allegations related to his misappropriation of plaintiffs' funds. The allegations against Kaplan fall into two broad categories: checks payable to New England Telephone Company on accounts not belonging to any of the plaintiffs, and checks payable to defendant Kaplan. Transgressions under both categories,

plaintiffs argue, constitute mail fraud.[8] According to the plaintiffs, between July 15, 1977, and September 25, 1978, Kaplan, or an individual in his employ, wrote twenty-five checks to New England Telephone on Robert Zabarsky's South Shore National Bank checking account; between July 13, 1977, and June 11, 1979, nine checks were written to New England Telephone on Zee–Bar, Inc.—N.H.'s checking account at the same bank. Complaint ¶¶ 63–66. Those checks total $4,331.07.

Plaintiffs rely on *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), to support their contention that Kaplan's check-writing scheme constitutes mail fraud. In *Pereira*, the Supreme Court held that an individual who presented a check drawn on an out-of-state bank for payment to another bank is assumed to have the common knowledge that the check would subsequently be mailed to the drawee bank for collection, thereby satisfying the mailing element required by the statute. *Id.* at 8–9, 74 S.Ct. at 362–63. Plaintiffs contend that Kaplan, like the defendants in that case, so " 'cause[d]' the mails to be used." *Id.* at 9, 74 S.Ct. at 363 (citing *United States v. Kenofskey*, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836 (1917)).

While the simplicity of this argument is attractive, it is not legally accurate. For example, in *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), the Court reversed a mail fraud conviction based on inter-bank mailings that occurred after the defendants received money. The Court stated,

> The scheme in each case had reached fruition. The persons intended to receive the money had received it irrevocably. It

was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. It cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires.

*Id.* at 94, 65 S.Ct. at 151 (footnote omitted).

Subsequently, in *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), the "mailing" element of the mail fraud charge against a credit card thief was allegedly supplied by the fact that the defendant knew that each merchant to whom the stolen card was presented would mail an invoice to the card-issuing bank. The Court found these mailings insufficient to support mail fraud charges because the scheme had "reached fruition when he checked out of each motel." *Id.* at 402, 94 S.Ct. at 649.

The Court next addressed the issue in *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), wherein the defendant sold automobiles with turned-back odometers to a number of retail dealers. The Court found the mailing element met by the fact that the title and registration for each automobile was eventually mailed to the dealer, albeit long after defendant sold the vehicles to the dealer.

The Court distinguished *Schmuck* from past cases as follows:

> The title-registration mailings at issue here served a function different from the mailings in *Kann*, ... and *Maze*. The intra-bank mailings in *Kann* and the credit card invoice mailings in ... *Maze* involved little more than post-fraud ac-

---

**8.** 18 U.S.C. § 1341 provides,

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or

authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

counting among the potential victims of the various schemes, and the long-term success of the fraud did not turn on which of the potential victims bore the ultimate loss. Here, in contrast, a jury rationally could have found that Schmuck by no means was indifferent to the fact of who bore the loss. The mailing of the title-registration forms was an essential step in the successful passage of title to the retail purchasers. Moreover, a failure of this passage of title would have jeopardized Schmuck's relationship of trust and goodwill with the retail dealers upon whose unwitting cooperation his scheme depended. Schmuck's reliance on our prior cases limiting the reach of the mail fraud statute is simply misplaced.

In light of *Schmuck,* Kaplan's alleged check writing on Zabarsky's and Zee–Bar, Inc.—N.H.'s accounts in payment for services from New England Telephone not incurred by plaintiffs satisfies the mailing requirement. The scheme did not reach fruition until Kaplan mailed the checks to New England Telephone and Kaplan's account was subsequently credited, thereby satisfying the debt. Were the mails not used, the scheme would not have been completed. These acts, therefore, qualify as predicates.

■ Also at issue is whether the checks Kaplan allegedly wrote to himself on plaintiffs' accounts as compensation for work neither scheduled nor completed fall within the proscriptions of the mail fraud statute. Based on the holdings of *Kann* and *Maze,* the court finds that these allegations fail to satisfy the mailing element of the mail fraud statute, and therefore fail as predicate acts.

For the improper telephone bill payments to qualify as a "pattern of racketeering activity," plaintiffs must demonstrate that the acts were related and that they amounted to continued criminal activity. *Fleet Credit Corp., supra,* 893 F.2d at 445.

■ Relatedness is established by demonstrating that the predicate acts " 'have the same or similar purposes, results, participants, victims, or methods of commis-

sion, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* at 445 (quoting *H.J., Inc., supra* ). These acts involve checks written in satisfaction of debts that plaintiffs allegedly did not incur or for services they did not receive. It is evident that, as asserted, it is one scheme to defraud plaintiffs.

■ The requisite continuity may be established by demonstrating that the predicate acts amounted to repeated conduct in a closed period of time. *Fleet Credit Corp., supra,* 893 F.2d at 446.

'A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.'

*Id.* at 446 (quoting *H.J., Inc., supra,* 492 U.S. at 242, 109 S.Ct. at 2902).

■ The twenty-five checks to New England Telephone were written over a twenty-three-month period. These allegations suggest more than "sporadic" criminal activity; they occurred instead on a regular basis and over a period of time long enough to suggest "long-term criminal conduct." *Compare Fleet Credit Corp., supra,* 893 F.2d at 447 (mailing of 95 checks over four and one-half year period amounts to continued criminal activity) *with Lincoln House, Inc., supra,* 903 F.2d at 846–47 (six acts of mail fraud over a twenty-six month period suggests " 'only sporadic criminal activity' that would neither amount to nor pose a threat of continued criminal activity").

"Once a RICO pattern has been established, it does not follow that every malefaction a defendant commits will give rise to civil RICO liability." *Miranda v. Ponce,* 948 F.2d 41 (1st Cir.1991). What remains, then, after sifting through the many allegations of mail and wire fraud as predicate acts of a pattern of racketeering activity is

the pattern established by the payments to New England Telephone. These acts alone the court considers in light of the four-year statute of limitations.

■ "[E]ach time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962 a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury." *Rodriguez v. Banco Central,* 917 F.2d 664, 665 (1st Cir. 1990).

Kaplan, who resigned on August 16, 1985, contends that plaintiffs knew or should have known that he committed the predicate acts by August 17, 1985, precisely four years prior to the date these claims were filed. In support, defendant points to two items of correspondence from Zabarsky: a letter to Kaplan dated August 17, 1985 (Exhibit E) and a mailgram to Shuman dated August 19, 1985 (Exhibit C). In each, Zabarsky indicates knowledge of Kaplan's neglect.

It does not follow, however, that knowledge of neglect constitutes knowledge of fraud. Nor does it follow that Zabarsky should have known about this alleged fraud. Furthermore, it was not until June 16, 1986, that Zabarsky received from Kaplan the canceled checks from two of the checking accounts in question. Complaint ¶ 55. At the minimum, there is a question of fact as to whether plaintiffs knew or should have known that Kaplan had misapplied their funds.

■ Finally, Kaplan argues that Zee–Bar, Inc. of Vermont has no standing because it suffered no injury. Recovery under RICO is not limited to direct victims. As stated above, "[d]amages that 'flow from the commission of the predicate acts' are recoverable." *Roeder, supra,* 814 F.2d at 29 (quoting *Sedima, supra,* 473 U.S. at 497, 105 S.Ct. at 3285). Because Zee–Bar, Inc.—N.H. was merged into Zee–Bar, Inc. of Vermont, the successor corporation arguably suffered indirectly the former's injury and is the only available entity to bring suit. *See Roeder, supra,* 814 F.2d at 29.

Accordingly, Kaplan's motion for summary judgment on Count I is granted except to the extent that Count I includes charges of mail fraud related to Kaplan's improper payment of New England Telephone bills.

*Count II*

As in Count I, plaintiffs allege wire and mail fraud as the racketeering activity in which Kaplan engaged as a partner in K & S from November 1, 1983, until his resignation on August 16, 1985.

Count II includes allegations that Kaplan: (1) used the mails and wires to send to each plaintiff fraudulent bills for work that was never done, Complaint ¶ 208; (2) used the wires to telephone requests for tax payments which were instead diverted by Kaplan and deposited into a mutual fund money market account in his name, Complaint ¶ 209; and (3) utilized the interstate banking system to pay bills and expenses not attributable to the plaintiffs, Complaint ¶ 210.

These allegations are discussed in turn.

■ The corporations allege that in January 1984 Kaplan mailed to each of them an invoice indicating an unpaid balance when no unpaid balance existed. Complaint ¶¶ 85–86. In March 1984, defendant invoiced each of the plaintiff corporations for the preparation of tax returns which had not been filed. Complaint ¶¶ 87–88. Finally, on August 6, 1985, Kaplan mailed a bill to both Zee–Bar, Inc., and Woodstock Harness (a trade name for Zee–Bar, Inc. of Vermont), again for the preparation of tax returns which had not been filed. According to the record, however, Zabarsky acknowledges that these bills were not paid, and no evidence is supplied by plaintiffs to the contrary. Defendant is therefore correct in asserting that the August 1985 bills cannot be considered predicate acts, as no injury resulted.

■ The January bills, defendant argues, which purported to show a balance due based on past unpaid bills, are barred by the four-year statute of limitations. *Rodriguez, supra,* 917 F.2d at 665. Kaplan, in support of this contention, points to

the complaint, in which plaintiffs assert they had never received a previous bill. Defendant contends that if the corporations were aware in January 1984 that they had never received a bill previous to the ones at issue, they should have known at the time they received these follow-up bills that they were incorrect. The court agrees, and finds that the four-year statute of limitations precludes reliance on the January bills.

■ The March 1984 bills for the preparation of unfiled returns, however, cannot so easily be dismissed. In an effort to minimize their impact, Kaplan refers to these invoices as "one mailing" and therefore as "insufficient to satisfy § 1961(5)'s requirement that a plaintiff allege at least two predicate acts." Memorandum of Law Supporting Defendants' Motion for Summary Judgment at 25. Each invoice, however, constitutes a separate mailing and therefore a separate act of mail fraud.[9] These are predicate acts.

■ Likewise, telephoning Zabarsky interstate for money, all or a portion of which was diverted by Kaplan, could constitute wire fraud.[10] On April 4, 1984, Kaplan requested from Zabarsky $1,005 for the payment of Zabarsky's taxes. Complaint at ¶ 122. It is unclear how this request was made, although defendant seems to acknowledge that it was made by telephone. Of this $1,005, $620 was paid by Kaplan to the Internal Revenue Service, and $63 was paid to the State of Vermont. The balance of $322 is not accounted for. Complaint ¶ 122. On July 30, 1974, Kaplan requested $7,500 from Zabarsky to pay a New Hampshire Business Profits Tax. Again, it is unclear by what means this request was made, although the wires are

implicated. This amount was deposited into a mutual fund money market account in Kaplan's name. Complaint ¶¶ 126–29. Restitution was made to Zabarsky by Kaplan on September 20, 1985, for this sum and the interest which it would have earned. Complaint ¶ 130.

■ Kaplan argues, again correctly, that the statute of limitations applies to bar the claim of the unaccounted-for $322. Zabarsky signed his own income tax returns. Zabarsky Deposition I at 134. While he states in his deposition that he does not understand how his tax liability is computed, he does understand and "can read assets, liabilities...." *Id.* at 47. It should have been obvious to plaintiff in April 1984 when he signed the return that he had overpaid Kaplan in the amount of $322. Zabarsky is barred by the statute of limitations from bringing this claim now.

■ The diversion of $7,500 also fails as a predicate act. The sum was repaid, with interest. Therefore, Zabarsky has suffered no injury and has no standing to bring this claim. *Bennett, supra.*

■ The final allegation is that Kaplan utilized the interstate banking system to pay bills and expenses not attributable to the plaintiffs. Complaint at ¶ 210. However, this simple allegation that defendant "used the banking system", without evidence of "time, place, or content" of mail or wire communication, fails to demonstrate a predicate act. *Fleet, supra,* 893 F.2d at 445.

■ The only predicate acts within this twenty-one-month period, then, are the March 1984 mailing of 1984 invoices for the preparation of tax returns which were, in

---

9. These invoices, mailed in furtherance of a scheme to defraud and before the fraud reached fruition, satisfy the mailing element of 18 U.S.C. § 1341. *See Schmuck, supra,* 489 U.S. at 722, 109 S.Ct. at 1453.

10. **§ 1343. Fraud by wire, radio, or television**
 Whoever, having devised or intending to devise any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations,

or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

fact, not filed. While these predicates satisfy the "relatedness" component of the pattern requirement, because "they have the same or similar purposes, results, participants, victims or methods of commission," *Fleet Credit Corp., supra,* 893 F.2d at 445, they fail to establish a RICO claim because they lack the requisite continuity. "Racketeering acts ... do not constitute a pattern simply because they number two or more." *Id.* at 444 (citing *Roeder, supra,* 814 F.2d 22). In addition, plaintiffs must demonstrate that the predicates "amount to or pose a threat of continued criminal activity." *Id.* (citing *H.J., supra,* 109 S.Ct. at 2900).

 As discussed above, "predicate acts amount to continued criminal activity when they form a 'closed period of repeated conduct.'" *Id.* at 446 (quoting *H.J., supra,* 109 S.Ct. at 2902). It was by demonstrating continuity in this manner that plaintiffs were at least partially successful in Count I. Because one month is an insufficient period of time in which acts can "amount to continued criminal activity," *see, e.g., H.J., supra,* 109 S.Ct. at 2899; *Fleet, supra,* 893 F.2d at 447, plaintiffs attempt, instead, to prove that the predicates "pose a threat of continued criminal activity." This may be accomplished by demonstrating "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 447 (citing *H.J., supra,* 109 S.Ct. at 2902).

In this attempt, plaintiffs assert that Kaplan did bulk mailings on letterhead in which both partners' licensing status was misrepresented. They do not indicate, however, who may have been injured by this misrepresentation, nor do they speculate as to how. They simply state that, in the period encompassed by Count II, K & S took in a substantial amount of money from clients other than plaintiffs. This bare allegation, with nothing more, does not point to continued criminal activity.

Because the plaintiffs have failed to establish all elements of a civil RICO claim, defendants' motion for summary judgment is granted as to Count II.

## Conclusion

Defendants' Motion to Allow Filing of Reply to Plaintiffs' Objection to Motion for Summary Judgment in C. 89–401–D Complaint (document no. 71) is granted.

The motion of defendants Kaplan and Shuman, C.P.A., to dismiss (document no. 64) is granted.

The motion to dismiss Count III of the 88–60–D complaint (document no. 62) is granted.

In the light of the effect that the above disposition is likely to have upon this case, the court will hold a status/settlement conference case on Wednesday, June 10, 1992, at 9 a.m.

SO ORDERED.